UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                 :

E.E., individually and on behalf of G.E.,          :

                          Plaintiff,      :

                                                   :             13 Civ. 06709 (LGS)

               -against-                 :

                                                   :        <u>ORDER AND OPINION</u>

NEW YORK CITY DEPARTMENT OF          :
EDUCATION,

                          Defendant.    :

                                                   :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff E.E., individually and on behalf of his child G.E., brings this action against the

New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  Plaintiff seeks review of the May 23, 2013,

decision of the New York State Review Officer ("SRO Decision") reversing the March 19, 2012,

decision of the Impartial Hearing Officer ("IHO Decision"), which found that the DOE had failed

to provide a free and appropriate education ("FAPE") to G.E. during the 2011-2012 school year.

The parties have cross-moved for summary judgment.  Because the SRO's reversal of the IHO's

decision is sufficiently supported by the record, Plaintiff's motion is denied and the DOE's

motion is granted.

## I.      STATUTORY FRAMEWORK

        The IDEA mandates that states receiving federal special education funding provide

disabled children with a FAPE.  20 U.S.C. § 1412(a)(1)(A); *M.W. ex rel. S.W. v. New York City

Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).  "To ensure that qualifying children receive a

FAPE, a school district must create an individualized education program ('IEP') for each such

child." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  An IEP is a

written statement that "'describes the specially designed instruction and services that will enable

the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child." *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175); *see* 20 U.S.C. § 1414(d).

New York delegates the development of an IEP to a local Committee on Special Education ("CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1) (McKinney). At a minimum, the CSE is composed of the student's parent(s), a special education teacher, a regular education teacher if the student participates in a regular education program, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician and a parent of another student with a disability. *See* Educ. § 4402(1)(b)(1)(a). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175.

If a parent believes that the DOE has failed to provide a FAPE to his or her child, the parent may "unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W.*, 725 F.3d at 135 (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993)). To seek reimbursement, the parent must first file a due process complaint with the DOE, which triggers administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO"). *See M.W.*, 725 F.3d at 135 (citing 20 U.S.C. §§ 1415(b)(6), (f); Educ. § 4404(1)). The IHO hearing is governed by the three-part *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c): "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.*, 725 F.3d at 135 (footnote omitted).

The IHO's decision may be appealed to a State Review Officer ("SRO").  *See* Educ. § 4404(2); *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379-80 (2d Cir. 2003)).  The SRO's decision is the final administrative decision.  An aggrieved party, however, may seek review of the SRO's decision by commencing an action in federal district court.  *See* 20 U.S.C. § 1415(i)(2)(A); *M.W.*, 725 F.3d at 135-36.

## II.    BACKGROUND

G.E. is a boy who has been diagnosed with autism spectrum disorder, global development delay, feeding disorder, sensory integration disorder and childhood apraxia of speech.  Before the start of the 2011-12 school year, he was six years old.  He is nonverbal but communicative through means such as vocal approximations, gestures and signs, and is a fluent reader.  He is under-responsive to and seeks constant sensory input.  He becomes dysregulated when he encounters limitations or the unfamiliar.  He has low muscle tone and exhibits difficulty with oral movements, which leads to overall rigidity with food choices.

Since the summer of 2009, G.E. has attended the Rebecca School ("Rebecca"), a private school that subscribes to the "Developmental Individual Difference Relationship-based model" ("DIR") of educating developmentally challenged children.  For the 2011-12 school year, he was enrolled in an "8:1:3" class – i.e., a class with eight students, one teacher and three teaching assistants.

On April 29, 2011, a CSE convened to develop G.E.'s IEP for the 2011-2012 school year. The CSE consisted of E.E., G.E.'s father; Laura Gufarotti, G.E.'s classroom teacher at Rebecca; Mandy Zoffness, G.E.'s social worker at Rebecca; Rose Fochetta, a DOE school psychologist; Feng Ye, a DOE representative and special education teacher; and a parent member.  The CSE

heard from Plaintiff and Ms. Gufarotti, and reviewed a 2010 classroom observation report filed by Fochetta, a 2010 progress report from Rebecca and a 2009 psychoeducational evaluation.  The IEP made findings about and identified needs with respect to G.E.'s physical, academic, social and emotional development, and set a number of short-term objectives and annual goals for him. The IEP recommended that G.E. be enrolled year-round in a "6:1:1" class – i.e., a class with six students, a teacher and a classroom paraprofessional – and additionally be attended by a full-time 1:1 transitional paraprofessional.  The IEP also recommended that G.E. receive five 30-minute sessions each of speech, physical and occupational therapy, and two 30-minute sessions of counseling, every week.

On May 11, 2011, G.E.'s parents entered into an agreement with Rebecca to enroll G.E. there for the 2011-12 school year.  Plaintiff paid Rebecca a deposit of $2,000 the next day.  The agreement provides that should G.E.'s parents decide before September 7, 2011, to enroll him in a school recommended by the CSE, they "w[ould] be released from continuing responsibility for tuition payments . . . and Rebecca School w[ould] reimburse [them] for all prior payments, excluding non-refundable deposit."

On June 4, 2011, the CSE issued its final notice of recommendation in which it identified "P396K @ P289K" as the school into which G.E. would be placed pursuant to the IEP.  On June 15, 2011, Plaintiff visited the site with Ms. Zoffness.  During their visit, they noted a number of issues: (i) the class in which G.E. would enroll was to be held at one site ("P.S. 396K") in the summer months and another site ("P289K") thereafter due to the lack of air conditioning at the latter; (ii) Plaintiff and Ms. Zoffness were able to enter P289K through an unlocked door with no security; (iii) the 500 children served by P289K are dropped off at and entered the school through the same entrance; (iv) 150 children eat lunch in the cafeteria at one time; (v) P289K's special

education coordinator did not know what a transitional paraprofessional is; (vi) P289K lacks a sensory gym; and (vii) P289K does not offer a feeding program.  Two days later, G.E.'s parents notified the CSE of their intent unilaterally to place G.E. in private school, citing the reasons noted above.

### A.    IHO Proceedings

On July 7, 2011, the parents filed a due process complaint, alleging that the DOE had failed to provide a FAPE to G.E. on both procedural and substantive grounds.  The specified grounds included failure to rely on necessary evaluations to gauge G.E.'s current skills levels properly; failure to recommend parent training and counseling as a related service; and failure to place G.E. in a smaller and more supportive environment that would benefit him educationally. The due process complaint also raised the aforementioned issues that Plaintiff had noted during his visit of P289K.  The parents sought relief in the form of reimbursement for tuition at Rebecca for the 2011-2012 school year.

A hearing before an IHO was held on four non-consecutive days between September 22 and December 19, 2011.  A total of six witnesses testified, including individuals who served on the CSE that drafted G.E.'s IEP.  The DOE presented testimony from Barbara Horowitz, P.S. 396K's intake coordinator; Hansraj Soodoosingh, the teacher during the summer months for the proposed 6:1:1 class in which G.E. would have been enrolled; and Ms. Ye.  Plaintiff presented testimony from Tina McCourt, Rebecca's program director; Ms. Gufarotti; and himself.

On March 19, 2012, the IHO issued a 23-page decision in which she found, pursuant to the *Burlington/Carter* test, that (1) the DOE failed to demonstrate the appropriateness of the 2011 IEP for G.E.; (2) G.E.'s placement at Rebecca was appropriate to meet his educational needs; and (3) equitable considerations support Plaintiff's tuition reimbursement claim.  Specifically with

respect to the first prong, which requires the DOE to establish that it provided a FAPE, the IHO found that the CSE had (i) failed to consider adequate and appropriate evaluative material, thereby causing a loss of educational opportunity for G.E.; (ii) the CSE failed to consider any class size except 6:1:1, and did not listen to Plaintiff when he said that a 6:1:1 would not provide enough support; (iii) G.E. would not have been appropriately grouped for academics in Mr. Soodoosingh's class at P.S. 396K; (iv) the size and student mix of P289K would have provided too much stimulus for G.E.; (v) the gym at P289K would not have provided the sensory diet that G.E. needed; (vi) the IEP failed to address G.E.'s low tolerance for noise and other stimuli; (vii) the IEP failed to address how a large cafeteria serving up to 150 children at once could implement a feeding program; and (viii) the IEP failed to mention G.E.'s need for sensory input for his jaw and face.  Although the IHO found that G.E. required individual instruction to make educational progress, she did not find that such instruction had to be provided by a special education instructor.  The IHO ordered the DOE to pay $4,000 to Plaintiff to reimburse him for what he had already paid Rebecca, and $90,750 to Rebecca for the balance of the tuition for the 2011-12 school year.

### B.    SRO Proceedings

On April 18, 2012, the DOE appealed the IHO Decision, arguing that pursuant to the *Burlington/Carter* test, (1) it offered G.E. a FAPE; (2) G.E.'s parents failed to demonstrate that Rebecca was appropriate for him; and (3) equitable considerations precluded relief.  With respect to the first prong, DOE argued that (i) the CSE relied on sufficient and adequate evaluative information to develop the 2011 IEP; (ii) the IEP addressed G.E.'s sensory and feeding needs, and the record does not support a finding that a sensory gym or a feeding group was necessary for the realization of educational benefits; (iii) the recommended program – a 6:1:1 classroom, a 1:1

transitional paraprofessional and related services – was appropriate for G.E.; (iv) G.E. would have been suitably grouped in Mr. Soodoosingh's summer class at P.S. 396K; (v) findings on the appropriateness of the education that G.E. would have received at P.S. 396K or P289K are impermissibly speculative; and (vi) Plaintiff, as G.E.'s parent, was afforded a meaningful opportunity to participate in the development of the IEP.

On May 23, 2013, the SRO issued a 23-page opinion sustaining the DOE's appeal and reversing the IHO Decision. The SRO found that the DOE met its burden of demonstrating that it offered G.E. a FAPE for the 2011-12 school year, and thus did not reach the second and third prongs of the *Burlington/Carter* analysis. First, the SRO found that G.E.'s parents were afforded the opportunity to participate meaningfully in the development of G.E.'s IEP. With respect to the adequacy of G.E.'s IEP, the SRO found that (i) the CSE relied on adequate evaluative information about G.E. to develop his IEP; (ii) the CSE's recommendation of a 6:1:1 classroom, a full-time 1:1 transitional paraprofessional and related services was appropriately designed to enable G.E. to receive educational benefits; and (iii) the IEP sufficiently addressed G.E.'s sensory and feeding needs. With respect to the CSE's placement of G.E. at P.S. 396K and P289K, the SRO held that (i) G.E.'s parents could not challenge the implementation of the IEP after having rejected it; and (ii) even if such a challenge were allowed, the record did not support a finding that the recommended school would have been unable to implement the IEP so as to adequately address G.E.'s sensory and feeding needs and appropriately group him for academics.

On September 24, 2013, Plaintiff commenced this action to appeal the SRO Decision. Plaintiff and the DOE filed cross-motions for summary judgment on December 20, 2013, and January 27, 2014, respectively.

### III.    STANDARD

A motion for summary judgment in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dept't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005); *accord M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions.") (internal quotation marks and citations omitted)).  The task of a district court reviewing an SRO decision is to determine whether the SRO's decision is supported by "the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim*, 346 F.3d at 380 (internal quotation marks omitted).  In evaluating the sufficiency of an IEP, neither the administrative officers nor the courts may rely on "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP . . . ." *R.E.*, 694 F.3d at 186.

A district court "must give due weight to [the administrative] proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (alterations in original) (internal quotation marks and citation omitted).  Accordingly, a federal court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *M.W.*, 725 F.3d at 139. "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244.

Where the IHO and the SRO reach conflicting decisions, federal courts "must defer to the

reasoned conclusions of the SRO as the final state administrative determination." *M.H*, 685 F.3d at 246. "The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). A reviewing court may take into account "whether the decision being reviewed is well reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (internal quotation marks and citation omitted).

To determine whether an IEP complies with the IDEA, "courts make a two-part inquiry that is, first, procedural, and second, substantive." *Id.* at 189-90. The procedural inquiry requires courts to examine "whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *Id.* at 190 (internal quotation marks and citation omitted). Procedural violations warrant reimbursement only where the violations individually or cumulatively "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decision[-]making process,' or 'caused deprivation of educational benefits.'" *Id.* (first alteration in original) (quoting 20 U.S.C. § 20 U.S.C. 1415(f)(3)(E)(ii)).

The substantive inquiry requires courts to "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *Id.* at 190. The IDEA does not "guarantee any particular level of education," or "require that a child be provided with the optimal programmatic alternative." *C.F. ex rel. R.F.*, 746 F.3d at 72 (internal quotation marks and citation omitted). Instead, it requires "selection of a program that provides a 'basic floor of opportunity,'" and that is "likely to produce progress, not regression." *Id.* (internal quotation marks and citation omitted). Unlike procedural inadequacy,

"[s]ubstantive inadequacy automatically entitles the parents to reimbursement."  *R.E.*, 694 F.3d at 190.

## IV.   DISCUSSION

### A.   Deference

As a preliminary matter, Plaintiff argues that the SRO Decision is flawed because it (i) failed to render a decision within 30 days after receipt of the appeal pursuant to N.Y. Comp. R. & Regs. tit. 8, § 200.5(k)(2); (ii) improperly considered retrospective evidence; (iii) ruled against the weight of evidence by cherry-picking; and (iv) failed to apply the applicable statutes, rules and case law.  Plaintiff further contends that the SRO's conclusory determinations are not entitled to deference.  None of these arguments provides a sufficient basis to give the SRO Decision less deference.

First, while Plaintiff is correct that the SRO rendered her decision far past the statutory deadline, no authority permits courts to give less respect to SRO decisions on the basis of delay, nor is there any logical reason to do so.  *Accord M.L. v. New York City Dep't of Educ.*, 13 Civ. 574, 2014 WL 1301957, at *11 (S.D.N.Y. Mar. 31, 2014) ("Although the Court agrees with Plaintiffs that the State Review Office[r]'s routine delays in issuing decisions is problematic, it has found no authority in IDEA cases that allows it to 'declare the SRO's decision a nullity.'").

To illustrate his other arguments, Plaintiff cites the discussion in the SRO Decision about the adequacy of the recommended 6:1:1 class.  Plaintiff does not indicate which part of the SRO's opinion on the issue relied impermissibly on retrospective evidence or incorrect law.  Moreover, Plaintiff's assertion that "the [SRO's] reasons for arriving at [her] conclusion are never explained and . . . left a mystery to the reader" is belied by the relevant section of the SRO Decision, which supports its finding with citations to the IEP and testimony from the IHO proceedings and

specifically addresses Plaintiff's concerns.  Nor are Plaintiff's arguments generalizable to other sections of the SRO Decision.  The SRO's 23-page opinion articulates reasoned explanations for each conclusion, parses the parties' arguments in greater detail than the IHO Decision and contains ample citations to the record in support of each finding.  Because "[c]ourts generally 'defer to the final decision of the state authorities'" if the decision is "thorough and careful," *M.H.*, 685 F.3d at 241 (citation omitted), and because the SRO's findings are supported by a preponderance of the evidence, the SRO Decision is entitled to deference.

### B.     Appropriateness of the IEP

Plaintiff challenges the appropriateness of G.E.'s IEP developed by the CSE on the following procedural and substantive grounds: (i) the CSE developed the IEP without procuring the necessary evaluations to assess G.E.'s academic, social and emotional status and needs; (ii) a transitional paraprofessional cannot make up for the inappropriateness of the recommended 6:1:1 class; and (iii) the CSE ignored G.E.'s feeding needs.  These challenges are not persuasive.

#### i.     Procedural Violations

With respect to the CSE's procurement of the necessary evaluations to develop the IEP, Plaintiff makes two distinct but related arguments: (i) the CSE committed procedural error by purporting to rely in part on a two-year-old psychological evaluation of G.E. and failing to conduct a reevaluation; and (ii) the CSE in fact relied on only one source of information, which does not support the recommendations in the IEP.  With respect to the first contention, the Court finds that the CSE was entitled to develop its IEP in partial reliance on the older report and was under no obligation to conduct a new assessment.  The second contention is based on a faulty premise.

### 1.     Failure to Reevaluate G.E.

Ms. Ye testified that the CSE relied in part on a 2009 psychoeducational evaluation of G.E. that was conducted when he aged out of his preschool program. The 2009 evaluation had determined that G.E.'s "short attention span, severe speech and language delays, and cognitive, social and emotional delays prevented his participation in any formal testing," and described three attempts to administer standardized tests that were unsuccessful due to G.E.'s inability to maintain focus. Plaintiff contends that a reevaluation was warranted because G.E. had demonstrated "improved academic achievement and functional performance" in the intervening two years and because the DOE is required to assess students in "all areas related to the suspected disability, including . . . general intelligence . . . ." N.Y. Comp. R. & Regs. tit. 8, § 200.4(b)(4), (6)(vii).

Plaintiff's arguments fail for a number of reasons. First, the relevant rule provides that a reevaluation is required only if (i) the school district determines that one is warranted, (ii) the student's parent or teacher requests one, or (iii) the evaluation in question is three years old or older. *Id.* § 200.4(b)(4). Here, nothing in the record shows that Plaintiff or Ms. Gufarotti requested such a reevaluation, and the evaluation in question was only two years old at the time of use by the CSE. To the extent that it is necessary to determine whether reevaluation is warranted, the rule expressly entrusts that authority to the school district. *Id.* ("A [CSE] shall arrange for an appropriate reevaluation of each student with a disability if *the school district determines* that . . . improved academic achievement and functional performance of the student[] warrant a reevaluation . . . ."). Here, Ms. Ye, who represented the DOE at the CSE, testified that because of G.E.'s nonverbal nature, teacher observations were better tools for assessing G.E.'s academic performance than standardized tests. An independent review of the record also bears

out the questionable utility of a reevaluation, especially with respect to formal testing.  While

G.E. seemed to have made cognitive gains between 2009 and 2011 as Plaintiff contends, ample

evidence suggests that G.E.'s struggle with maintaining focus was ongoing,[1] and therefore would

have continued to prevent or complicate the administration of formal tests.

      Moreover, the CSE was not required to obtain specific types of evaluations over others.

Federal law requires CSEs only to "review existing evaluation data on the child, including – (i)

evaluations and information provided by the parents of the child; (ii) current classroom-based[]

. . . assessments[] and . . . observations; and (iii) observations by teachers and related services

providers . . . ."  20 U.S.C. § 1414(c)(1)(A).  "[O]n the basis of that review, and input from the

child's parents," the CSE then identifies what "additional data" is needed.  *Id.* § 1414(c)(1)(B).

"[T]he CSE has the discretion to determine that no new evaluation is required."  *M.Z. v. New

York City Dep't of Educ.*, No. 12 Civ. 4111, 2013 WL 1314992, at *8 (S.D.N.Y. Mar. 21, 2013)

(citing § 1414(c)(4)).  Here, as discussed further below, the CSE considered observations from

Plaintiff, teachers at Rebecca and a psychologist.  The DOE was well within its discretion to

determine, as it did, that no additional evaluation or testing was necessary.

### 2.        Failure to Rely on Multiple Evaluations

      Plaintiff also argues that the CSE, in effect, based the development of its IEP solely on the

2010 progress report from Rebecca, in violation of the rule requiring that the CSE use "no single

measure or assessment" as the "sole criterion" in developing an IEP.  N.Y. Comp. R. & Regs. tit.

8, § 200.4(b)(6)(v).  To the extent that this argument builds on the previous argument, i.e. that the

CSE should not have been allowed to consider the 2009 psychoeducational evaluation, it fails for

the reasons stated above.  The only evidence that Plaintiff adduces for this proposition is Ms.

---

[1] For example, the classroom observation filed in December 2010 by Ms. Fochetta suggests that
G.E. could not follow instructions for a sustained period of time unless constantly prompted.  The
IEP states that G.E. "c[ould] follow 3-step directions in class."

Ye's testimony, given in the context of comparing standardized tests to teacher observations, that "teacher's observation is very important" in G.E.'s case and that the CSE "rel[ied] on [it] for [G.E.'s] current functioning level."  Contrary to Plaintiff's assertion, Ms. Ye did not represent that the reliance was exclusive.  Moreover, that interpretation is inconsistent with her testimony just minutes earlier, in which she stated that the CSE relied on three documents – the Rebecca progress report, the 2009 psychoeducational evaluation and the classroom observation.  Indeed, she testified that on page 3 of the IEP, she "quoted [G.E.'s] cognitive functioning" from the 2009 evaluation.  Beyond the documents, Ms. Ye stated that the CSE also took input from Plaintiff and Ms. Gufarotti at its April 29, 2011, meeting.  The Court thus finds, based on a preponderance of the evidence and consistently with the relevant part of the SRO Decision, that the CSE did not impermissibly rely on a single measure in developing G.E.'s IEP.

Because the CSE had no duty to conduct a reevaluation of G.E. and was entitled to rely on the sources that it did to develop his 2011 IEP, the Court finds Plaintiff's contention that the CSE committed procedural error to be without merit.

### ii. Substantive Violations

Plaintiff further argues that the DOE failed to offer G.E. a FAPE on two grounds: (i) the recommended 6:1:1 class was insufficient to confer educational benefits upon G.E., even with a full-time 1:1 transitional paraprofessional; and (ii) the IEP failed to address G.E.'s feeding needs. To the contrary, the DOE has met its burden of demonstrating that the IEP was appropriate on both grounds.

### 1. Inadequacy of the 6:1:1 Class and a 1:1 Transit Paraprofessional

The SRO properly found that the IEP's recommendation of a 6:1:1 class, in conjunction with a full-time 1:1 transitional paraprofessional and related services, was appropriately designed

to address G.E.'s needs.  Under New York law, "[t]he maximum class size for special classes containing students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention, shall not exceed six students, with one or more supplementary school personnel assigned to each class during periods of instruction."  N.Y. Comp. R. & Regs. tit. 8, § 200.6(h)(4)(ii)(a).  Courts in this district have reasoned that "[w]ithin the general parameters of 8 N.Y.C.R.R. § 200.6, class size and student-teacher ratios 'involve questions of methodology more appropriately answered by the state and district decision-makers' than by federal judges."  *M.L.*, 2014 WL 1301957, at *11 (quoting *D.J. v. New York City Dep't of Educ.*, No. 12 Civ. 7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013)).

The SRO noted that the IEP recommended various targeted management strategies as well as a small, structured environment to address G.E.'s unique academic, social and emotional challenges, including his sensory-seeking, under-responsive and nonverbal behavior and distractibility.  For example, for G.E.'s academic management needs, the IEP proposed the use of redirection, repetition, visual cues, verbal prompts, sensory support and augmentative communication; and for his social and emotional management needs, the IEP suggested the use of calm and measured voices, sensory supports, periodic movement breaks, brushing protocol, chew tube and repetition of directions.  With respect to G.E.'s health and physical management needs, the IEP recommended continuing physical and occupational therapy.  The SRO specifically noted Plaintiff's testimony on G.E.'s need for intensive 1:1 instruction, and found that the DOE had appropriately addressed the issue by recommending a 1:1 transitional paraprofessional, who, as Ms. Ye testified, would help G.E. join group activities using his communication device, transition to public school and implement the management strategies mentioned above.  An independent

review of the record supports the SRO's conclusion that the IEP's recommendations are appropriate.  First, Ms. Ye's testimony makes clear – and the meeting minutes bear out – that Plaintiff's concern about G.E.'s need for a low student-to-adult ratio and intensive instruction was expressed at the CSE meeting, and that the 1:1 transitional paraprofessional was proposed in direct response to Plaintiff's expressed concern.  Second, the record shows that G.E. was capable of receiving educational benefits in a group instruction setting.  The Rebecca progress report observed, in December 2010, that "[G.E.] is able to share attention with adults and peers during both structured and unstructured activities in the classroom."  Additionally, the testimony of Ms. Gufarotti, G.E.'s teacher at Rebecca since 2009, shows that in her 8:1:3 class, G.E. routinely received instruction in group settings, including in reading and math.

While Plaintiff and Ms. Gufarotti both testified about their unease with the recommended 6:1:1 class, their objections did not take into account the addition of the full-time 1:1 transitional paraprofessional.  For example, when Plaintiff was asked whether the added paraprofessional adequately addressed his concern about the 6:1:1 ratio, he said "no," but did not give any further explanations.  Likewise, while Ms. Gufarotti stated that she "felt like [a 6:1:1 class] was too few students and also too few adults," she did not say whether the 1:1 transitional paraprofessional eased her concern.  Any unarticulated reservations that Plaintiff and Ms. Gufarotti may have had about the adequacy of a 1:1 transitional paraprofessional in a 6:1:1 class context does not defeat the DOE's otherwise successful showing that the 2011 IEP offered a FAPE to G.E.  *See F.L. ex rel. F.L. v. New York City Dep't of Educ.*, 553 F. App'x 2, 8 (2d Cir. 2014) (summary order) (affirming finding that student was not denied a FAPE where IEP proposed 6:1 class with 1:1 paraprofessional and "[private school] teachers uniformly testified that [the student] can only learn in a 1:1 setting [but] they did not explain why this could not be effected through 1:1

16

instruction by a supervised behavioral management paraprofessional").  Indeed, when asked why the low student-to-adult ratio at Rebecca was beneficial to G.E., Ms. Gufarotti stated, "I think that's really helpful for him because he usually needs one on one support during the group to participate because of his communication challenges."  Ms. Gufarotti's testimony in this connection undermines Plaintiff's contention that G.E. needs more adult presence for instruction as opposed to behavioral support purposes, and bolsters the DOE's position that a full-time 1:1 transitional paraprofessional is sufficient to help G.E. receive educational benefits in a 6:1:1 class.[2]

In view of the SRO's reasoned decision and the weight of the evidence, Plaintiff's claim that the IEP's recommendation of a 6:1:1 class with a full-time 1:1 transitional paraprofessional was inappropriate is rejected.

## 2.    Failure to Address G.E.'s Feeding Needs

Plaintiff finally argues, with respect to the IEP, that the CSE failed to address G.E.'s feeding issues.  The SRO Decision correctly concluded, after a detailed discussion with ample citations to the record, that the CSE had sufficiently dealt with G.E.'s feeding needs so as to offer him a FAPE.

The SRO began by documenting observations in the 2010 Rebecca progress report that concern G.E.'s feeding needs, noting that he "presented with difficulties in motor planning and programming motor movements for . . . feeding" and "displayed an immature chew pattern," but had "recently made progress in independent cup drinking and in decreasing his overall rigidity with food choices[] when provided with maximum support" such as "reminders to chew appropriately and eat safely."  The SRO further noted the speech-language pathologist's comment

---

[2] The IHO reached the same conclusion as the SRO and this Court on this issue, finding that "[G.E.] requires individual instruction to progress academically" but that "the individual instruction need not solely be provided by a special education instructor."

that "future therapy sessions addressing feeding skills would focus on increasing awareness, strength, coordination, and range of motion within the student's oral mechanism, and on developing the student's tolerance of a variety of tastes and textures under closely monitored circumstances to ensure his safety."  The SRO then mentioned Ms. Ye's testimony that the CSE discussed G.E.'s feeding disorder at the meeting, a fact that is corroborated by a number of items in the IEP that are directed at the issue.  The SRO pointed to the IEP's identification of G.E.'s dietary limits "due to sensory concerns and rigidity" and the need to expand his repertoire of foods and increase oral input.  The SRO also called attention to one of the annual goals set by the IEP, namely the improvement of G.E.'s oral motor skills, and the related short-term objectives, including tolerating more oral motor exercises and new foods of various textures.

The Court finds that the SRO's review of the record with respect to this issue was comprehensive and that its well-reasoned ruling in favor of the DOE is entitled to deference.  Consequently, Plaintiff's claim that the IEP failed to address G.E.'s feeding needs is rejected.  To the extent that Plaintiff continues to press his contention regarding the potential inability of P.S. 396K or P289K to meet G.E.'s feeding needs, that contention is also rejected for the reasons below.

### C.    Appropriateness of G.E.'s Placement

The SRO correctly found that Plaintiff's contention that the assigned school did not meet G.E.'s needs should not be considered.  Parents may not rely on "[s]peculation that the school district will not adequately adhere to the IEP" as a basis for unilaterally placing their child in an alternative school.  *R.E.*, 694 F.3d at 195.  A challenge to "the DOE's choice of school, rather than the IEP itself" is appropriate only in "'a later proceeding' to show that the child was denied a free and appropriate education 'because necessary services included in the IEP were not provided

in practice.'" *F.L. ex rel. F.L.*, 553 F. App'x at 8 (quoting *R.E.*, 694 F.3d at 187 n.3).  Here, the SRO correctly found that the parents had rejected the IEP and unilaterally placed G.E. in Rebecca before the DOE's obligation to implement the IEP had accrued.  Plaintiff's claims regarding the potential inadequacies of P.S. 396K and P289K in their implementation of the IEP are impermissibly speculative and premature.

>    **D.**     **Second and Third Prongs of the Burlington/Carter Test**

Because the Court finds that the DOE has met its burden of showing that its IEP was appropriate (and because Plaintiff may not challenge the appropriateness of the school placement), the second and third prongs of the *Burlington/Carter* test – concerning the appropriateness of Plaintiff's placement and the equities respectively – need not be reached.

**V.     CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED.  The Clerk is directed to close the motions at Docket Nos. 11 and 13 and to close the case.

SO ORDERED.

Dated: August 21, 2014
>    New York, New York

>    **LORNA G. SCHOFIELD**
>    **UNITED STATES DISTRICT JUDGE**